The opinion of the Court was delivered by
Inglis, A. J.
The plaintiffs, Kenneth & Gibson are merchants of Columbia, engaged, inter alia, in buying cotton there and selling the same, by their agents, in Charleston, or sending it through that port for sale abroad. During a period of about fifteen months, extending from 1st July, 1865, to 1st October, 1866, they forwarded by defendants’ road, in various parcels, from time to time, to different consignees, in all, nineteen hundred and thirty-seven bales of cotton. The defendants’ charges for transportation were, in every instance, paid 'by the consignee in Charleston, after the delivery of the cotton and without objection. The rates of charges varied from two dollars to five dollars per bale, at different dates during the whole period, and the aggregate sum paid was about eight thousand five hundred dollars ($8,500.) The plaintiffs allege that the rates of charges for transportation, which they have thus paid, exceed those which the defendant is, by law, permitted to exact, by a large sum, perhaps some *292 four thousand dollars or more in the aggregate, and in this action of assumpsit for money had and received by the defendants for the use of the plaintiffs they seek to recover back this excess.
The road of the defendant, in its integrity through one branch, extends continuously from Columbia to Charleston, and supplies the ordinary, and, by reason of the greatly superior capacity, certainty and speed of its transportation, by far the most desirable mode of conveying produce and merchandise between the two points, though it cannot be said to have been, at the time of these transactions, the only mode within the plaintiffs’ power. This road had been destroyed almost entirely from Columbia to Orange-burg, (an intermediate point distant about fifty miles from Columbia,) and its bridge over the Congaree river had been burned, by the invading forces of the United States, in the early part of 1865, and, during the interval covered by these transactions, the injuries had been repaired, and the road put in running order.
It seems to have been proved or admitted, in the development of the plaintiffs’ case below, that the money sought to be recovered had been paid with a full knowledge by the plaintiffs of all the facts and law affecting their liability to pay the same, not as a condition precedent of the carriage or delivery of their cotton, but after the service had been fully performed, and the cotton was out of the possession and beyond the control of the defendant, and without objection or protest or notice of discontent. At least no evidence to the contrary of this was adduced.
The important question, which has been most fully and ably discussed at the bar is, whether, for such purpose and under such circumstances, the action can be maintained. The Judge, presiding below, considering that the case made by the plaintiffs fell within the operation of the approved maxim of the law, “ volenti non fit injura,” thought *293 it could not, and, at the defendant’s instance, ordered a nonsuit. The motion here is to set aside the nonsuit.
The action for money had and received has been as favorite a subject of eulogium on the law, as the prayer for general relief has been on the equity side of the Court. Lord Mansfield in 1760, in Moses vs. Macfarlan, (2 Burr, 1005,) said: “This kind of equitable action, to recover back money, which ought not, in justice to be kept, is very beneficial, and, therefore, much encouraged.” “The gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.” And again, in 3786, in Towers vs. Barrett, (1 Ter. Rep. 134,) “I am a great friend to this action for money had and received; it is a very beneficial action and founded on principles of eternal justice." “I do not think the action can be too much encouraged.” And as was to be expected, we find, very soon after, Buller, J., who was one of Lord Mansfield’s puisne Judges, saying in Straton vs. Rastall, (2 Ter. Rep. 370,) “ Of late years this Court has very properly extended the action for money had and received; it is founded on principles of justice.” But even so soon as that day, conception of the application of the action, so large as to provoke a caution, seem to have resulted from such bountiful commendations. He adds : “ I do not wish to restrain it in any respect. But it must be remembered, that it was extended on the principle of its being considered to be like a bill in equity. And in order to recover money, therefore, in this form of action, the party must show that he has equity and conscience on his side, and that he could recover it in a Court of equity.” Lord Alvanhey in 1802, in Johnson vs. Johnson, (3 Bos. & Pull. 162,) lifted a little higher note of warning. “In Moses vs. Macfarlan, some principles were laid down which are certainly too large and on which I do not mean to rely; such as that whenever one man has money *294 which another ought to have, an action for money had and received may be maintained, or that wherever a man has an equitable claim, he has also a legal action.” The general proposition that "wherever one person has, in bis hands, money equitably belonging to another, and which, therefore, ex aequo et bono, he ought not to retain, that other may recover it in assumpsit for money had and received,” has however, been so often affirmed by the Courts that it has come to have almost the force of a maxim — the wisdom and experience of the expounders and administrators of the law.
But where one man voluntarily pays money to another, it cannot be against conscience and right, that the receiver should retain it. An intelligent assent to its receipt by the payee as his own ought to estop the claim of the payer to have it restored. That cannot be said with propriety to be voluntarily done, where a formal assent thereto is induced by mistake, or procured by fraud or deception, as to facts material to control the operation of the will therein, any more than where such formal assent is extorted by the application of a force which fetters and obstructs its free working. "I think,” says Gibbs, J., in Brisbane vs. Dacres, (5 Taunt. 143,) “that when a man demands money of another as of right, and that other, with a full knowledge of the facts upon which the demand is founded, has paid a sum, he never can recover back the sum he has voluntarily paid.” “ I think that by submitting to the demand he that pays the money, gives it to the person to whom he pays it, and makes it his and closes the transaction. He that receives it has a right to consider it his without dispute • he spends it in the confidence that it is his, and it would be most mischievous and unjust, if he, who has acquiesced in the right by such voluntary payment, should be at liberty, at any time within the statute of limitations, to rip up the matter and recover back the money. He who received it is not in the same condition. He has spent it *295 in tbe confidence that it was his, and perhaps has no means of repayment.” “ It is very important,” says Abbott, C. J., in Skyring vs. Greenwood, (4 B. & C. 272; 10 Eng. C. L. Rep. 335,) “to every man that he should not be led to suppose that his income is greater than it is. Every prudent man accommodates his style of living to what he supposes is his income.” “It would be most mischievous,” says Butler, J., in our own case of Robinson vs. The City Council, (2 Rich. 317,) “to open such transactions as these, after money has been expended on the assumption that it was lawfully acquired.” “ It would remove the sense of security from past transactions, and let loose a great deal of treacherous litigation.” “ So far,” says Sir James Mansfield, O. J., in Brisbane vs. Dacres, “from its being contrary to eeguum et bonum, for the party receiving under such circumstances, to retain the money, I think it would be most contrary to seguvm et bonum if he was obliged to repay it.” “Eor see,” says he, “how it is, if the sum be large, it probably alters the habits of his life; he increases his expenses; he has spent it over and over again, perhaps he cannot repay it all, or without great distress — is he then, five years and eleven months afterwards, to be called upon to repay it ?”
Let us pause here a moment to consider the case before the Court, apart from the provisions of any positive statute, and inquire, in the light of these general principles, whether the plaintiffs have a case; whether the defendant has money which equitably belongs to the plaintiffs, and which, therefore, ex eequo et bono the defendant ought not to retain ; whether it is against conscience that this money which is here claimed, shall be kept by the party who has it. A consideration in services rendered in the transportation of tbe plaintiffs’ cotton was given in exchange for the money received. It has not been intimated that this consideration was inadequate, or that the rates charged *296 were, under tbe circumstances then existing, actually exorbitant. A considerable section of the defendant’s road bad been destroyed or rendered unfit for use. It was'then of the utmost importance to individuals of all classes but especially to the pecuniary interest of the merchants, as well as to the State and the country at large, that this means of rapid and effective communication between tbe seaboard and the interior should be restored as soon as possible.
It was of a consequence not now to be adequately appreciated, that what cotton and other produce had been saved from the rapacity of war should’find a market, a,nd thereby some medium of exchange, something that had really the power as well as the image and superscription of money, should be brought into circulation among our impoverished people. It may be, and it is probable, that only by these high charges for transportation was the defendant enabled to repair the road and rebuild the bridge. They have so applied the money thus acquired, and the country at large and the merchants especially, including these plaintiffs, have secured and since enjoyed the benefits of these renewed facilities for transportation and communication. It may be that if the freighters by this road, fully informed as they were of the legal restriction on the power of the company to regulate the rates of charges, of which they would now avail themselves, had then interposed the bar of that restriction and claimed its protection against the excess now complained of, the company would have been compelled, for want of means to repair or from unwillingness to make the sacrifice of their own interests, which would have been necessary to procure such means, to abandon their dismantled track. Which now, from the case and its probabilities- as presented in the brief, seems the more against ssquvm et bonum, that the defendant should retain the money which has been thus employed for the benefit of the public and particularly of freighters, or that the *297 latter having without complaint, or protest, or notice of discontent, paid this money when demanded and thereby encouraged a confidence in which it was used to accomplish a public benefit, of which they are reaping the advantages, should now, with the benefit purchased in their hands, take back the price with which it was procured ?
It is true indeed, that when the will, is constrained by the application of what the law considers force, to pay money which the receiver is not in conscience and honor entitled to, because such payment is not voluntary, the money may be recovered. Duress of goods even, or the making the payment of the money a condition precedent to the surrender of the possession of such goods, to the true owner or party entitled as against the holder, or to the according of any other right which the party ought not to withhold, is such force. Thus in Astley vs. Reynolds, (Strange, 915,) plaintiff having pawned goods with the defendant as security for the repayment of a loan of £20 ; the latter refused to restore them until plaintiff had paid him £10 additional, as interest for the use of the money for two months. He was allowed to recover back in this form of action. And so too in Chase vs. Dwinal, (Greenl. 134,) where the owner of a boom in the Penobscot river refused to deliver the plaintiff’s raft of lumber that had been driven by wind and current therein against the purpose and utmost efforts of the plaintiff', unless the latter would pay charges which, under the circumstances, the defendant was not authorized to exact. Such was the case also in the instance of money paid in order to obtain the delivery of policies of insurance which the defendant had no right to withhold in Shaw vs. Woodcock, (7 B. & C. 13.)
And this is still more the case when the money is exacted in this way, by one in office or authority, and colore officii. This was Morgan vs. Palmer, (2 B. & C. 729,) where the Mayor of Yarmouth exacted an illegal fee from a publican *298 as a condition of granting Mm a license. The plaintiff’s case is stronger, where, in addition to these circumstances, he disputed, at the time of payment, the defendant’s right, and paid the money under protest. So was Ripley vs. Gelston, (9 Johns. 201,) where plaintiffs, objecting to the demand as illegal, had paid to the officers of the customs, who had no right to exact it, a sum of money as tonnage and light money in order to obtain a clearance for his vessel; and Clinton vs. Strong, (9 Johns. 390,) where the plaintiff was compelled to pay certain costs for which he was not liable, to the marshal, before the latter would redeliver to him his ship and cargo which had been illegally seized for a supposed violation of the non-intercourse Acts. And this was the case of Alston vs. Durant, (2 Strob. 257.) To the demand of Sheriff Durant for costs and charges for which Alston was not liable, says Judge Withers: “The plaintiff expostulated and said he had not the money; the sheriff grew angry and required payment of these charges before he would deliver the negro. The plaintiff was required to pay as a condition precedent to the delivery of his property, and denying the obligation to pay, yet to regain his property he did pay.” But the facts of the case before this Court now take it entirely outside of this class of compulsory payments.
But it is said, it was illegal in the defendant to exact and take this excess over the maximum rate of charges prescribed by the statute, and, therefore, it is against equity and good conscience for the company to retain it. What is an illegal demand, except one that is not authorized by law; one which, according to law, the party preferring it has no right to make. If the demand which a plaintiff has paid is legal, if the defendant had a right to make it, then of course no question can arise, there would be no case. The plaintiff) on that supposition, has done no more than his duty.' It is exactly when and because the plaintiff was *299 not legally bound to pay, that be ever has a right of action to recover. It is the office of the law to define and protect private rights — of such it is the shield. But the party for whose protection its rules are contrived, may, if sui juris, wave that protection. It is a rule of the civil as well as of the common law that one may renounce or waive that which has been established in his favor. “ Quilibet ¡protest renun-ciare juri pro se introducto.” And it is because by the voluntary payment, with knowledge, in the law’s regard, of his legal rights, of that against the exaction of which the law would have protected him, he does thus put aside the shield of the law which is before him, that he cannot after-wards invoke its interposition. It defends'his possession, but if he voluntarily abandon this, it will not restore it. “ Volenti non fit injuria.” The creditor of an infant, or of one in whose favor the bar of the statute is complete, has no more legal authority or right to exact payment of his debt, than had this company to exact the excess of charges here complained of. The Giiy of Richmond had no authority, under the lav/-, to exact of the -vendue master, Judah, a tax upon the sales by him of goods which were his own property, but he paid his tax voluntarily, and without protest or dispute, and he was held by an unanimous Court not entitled to recover back the money so paid. (Richmond vs. Judah, 5 Leigh. 331.) The town of Bead-field had no authority of law for imposing taxes upon Smith, but he paid them voluntarily, and, therefore, was not permitted to recover the money. (Smith vs. Readfield, 24 Maine R. 145.) And so the city council of Charleston had no lawful power to exact of Bobinson the fee which he paid for his dray license, but he paid it voluntarily, and could not have it back. (Robinson vs. City Council, 2 Rich. 317.)
It is said, further, however, that this exaction of the defendant was a violation of the positive prohibition of a *300 statute; not only without authority of law, but against law; a malum prohibitum., and, therefore, the defendant cannot conscientiously retain it. On this subject a distinction is taken. If the contract, in execution or pursuance of which the money has been paid, is in itself immoral, or a violation of some general public policy incorporated into and enforced by the law, the party paying shall not have his action, he has concurred in the offence against the public — joined with the defendant in the commission of it— and the Courts will have nothing to do with it. “Ex turpi causa non oritur actio." The parties, as between themselves, will be left to their own devices, “ in pari delicto, potior est conditio d'fenclentis.” Thus the statute (19 Greo. 2 C. 37) prohibited a contract of insurance when the insured had no insurable interest — a mere speculation in chances — or what was called a gaming policy; and, therefore, where one, who having no interest in the ship or cargo, had paid a premium for an insurance thereon on a trip from China to London, after the safe arrival of the ship and the consequent termination of the risk, brought his action to recover the money he had paid, the Court refused its aid. (Lowry vs. Bordien, Doug. 467.) But this is only where he has persisted in prosecuting the unlawful enterprise to its consummation. For it is in furtherance of the policy of the law to discourage -and repress the prohibited contract or transaction by making its gains insecure, so long as this may be done without violating some higher policy or defiling its own hands. And therefore a locus penitentise is allowed to the party so long as the contract remains executory. If before the offence is consummated, the party paying, by bringing his action to recover back the money paid, disaffirm the obnoxious contract, he will be encouraged to do so, by giving him the right to recover; except where the contract is of too grossly immoral a nature for the Court to enter into any discussion of it. (Buller, J., in Lowry vs. Bordien, Doug. 467; Walker *301 vs. Chapman, Lofft. 342; White vs. Franklin Bank, 22 Pick. 181.)
But tliere are other laws which are designed particularly for the protection of individuals against oppression, extortion, deceit, &c. ' If •such laws are violated, and the defendant takes, advantage of the plaintiff's condition or situation, “then," says Lord Mansfield, “the plaintiff shall recover.” (Smith vs. Bromley, Doug. 696.) And again his lordship, in Browning vs. Morris, (Cowp. 790,) says, “ where contracts or transactions are prohibited by positive statute, for the sake of protecting one set of men from another set of men, the one from their situation and condition being'liable to be oppressed and imposed on by the other, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract.” A defendant, in such case, shall not take advantage of his own wrong and retain its fruits, because the law condemns and reprobates it, against him, for whose protection from his arts and wiles, that very condemnation was contrived. No superior policy of the law, growing out of those interests of the State which override all individual interests, imposes upon the law a masterly inactivity. Yet in the cases embraced within this class, although the immediate and primary purpose is the protection, from a particular mischief, of those who are, by reason of some infirmity in their condition, peculiarly exposed to, and unable to defend themselves against it; there is besides to some extent, a pernicious influence exerted upon society by the practices condemned, or a degree of immorality about them, and, therefore, the law defends the individual, by making the act an pffence against the State and punishable as such. And because the punishment is directed only against the party, from whose injurious practices it is the object of the statute to protect the weak, the unwary, the needy, &c., the parties to the transaction are said to be not in pari delicto. “ The *302 statute,” says Lord Mansfield, “itself, by the distinction, it makes, has marked the criminal.” (Browning vs. Morris) And because, as has been seen, the statute makes the act illegal in order to the protection of the individual, he says, in another of his axiomatic sentences, “It is absurd to say, that any one transgresses a law made for his own advantage, willingly.” And hence it is argued that a man cannot voluntarily pay money to procure the doing _of that which the law prohibits for his advantage and security. And this is a reasonable presumption; scarcely more.
The usury laws of former days furnish the most common illustration of this class of cases. The borrower is permitted to recover back the excess over legal interest which he has paid upon a usurious contract. And of this kind was the case of Wheaton vs. Hibbard, (20 Johns. 289.) The taking money from a bankrupt by his creditor, as a condition precedent to giving his signature to the certificate, is another illustration. This was Smith vs. Bromley, where a sister of the bankrupt paid money to the petitioning creditor in order to get him to sign his certificate, which he refused otherwise to do — though this was expressly prohibited by Stat. 5, Geo. 2, ch. 24, 5, 17. So money paid by the defendant in a qui tarn action to procure from the plaintiff’ therein a compromise of the action, since only the plaintiff, or informer, or other party prosecuting the action is liable to the prohibition and penalties of Stat. 18 Eliz. c. 5. (Williams vs. Hedley, 8 East. 378.) And so in Massachusetts, where there is a statute prohibiting any bank from “making or issuing any note, bill, check, draft, acceptance, certificate, or contract in any form whatever, for the payment of money at a future day certain” under a penalty, a party deposited a sum of money with a bank, on a contract that it.was to remain on deposit six months. He was allowed to recover his deposit on a count for money had and received, the Court overruling the defence that the *303 contract was illegal, and be, being a party, ought not to be permitted to maintain his action. The Court quoting the language of Lord Mansfield, already cited, said that the illegality or offence against the commonwealth is all on the side of the banh; the party contracting with the bank is liable to no penalty. (White vs. Franklin Bank, 22 Pick. 181.)
It is worthy of observation that Lord Mansfield, when first bringing out clearly this distinction between the two classes of illegal contracts, uses this language: "If the defendant has taken advantage of the plaintiff's situation or condition." (Smith vs. Bromley.) And when the money has been paid in order to, and as a condition precedent of, the doing of the prohibited act, in the law’s regard mischievous to the party procuring, but by himself at the time imagined to be of benefit, it may well be said that the just presumption is that his "situation or condition” was “taken advantage of,” and that the payment was, therefore, not voluntary; that he did not willingly join in the transgression of a law made for his own protection. But let it be supposed that after the imagined benefit has been reaped and fully enjoyed, and the party taking the benefit is no longer in the power of his adversary, but may defy him, and interpose the illegality of the contract in bar of an action to enforce it, he, in pursuance of his engagement in such contract, pays the money, shall he then recover? May he not, of his own head, waive the protection of the statute, and voluntarily renounce its benefit? How could it be said, in the circumstances supposed, that advantage was taken of his situation or condition? The law may still be vindicated and the public wrong avenged, by inflicting the penalty. This much may be said, that in every case which has come under observation in the books that are accessible, the money sought to be recovered had been paid in advance, before the loan was made, or the *304 bankrupt’s certificate signed, or tbe qui tarn action compromised. In Mills vs. Western Bank, (10 Cusbing, 22,) which was decided in 1852, the question seems to have arisen on the same statute which was under consideration in White vs. Franklin Bank, (decided in 1839, and- heretofore cited,) or on one similar to it. Notes had been discounted by the bank on an agreement that part of the proceeds were to be left on deposit without interest for a time certain, a form of transaction which was prohibited by the statute, and which subjected the bank offending therein to a fine. The plaintiff was endorser of the notes, and had secured his contract of endorsement by the deposit of collateral securities, which the bank had collected, and the suit was to recover the sum so collected. The Court said: “This statute was designed for the security and protection of the public,” and, regarding the contract as only so far void that the bank could not enforce it by action, held, that the payment by the plaintiff having been voluntarily made, he could maintain no action against the bank to recover it. The distinction between this case and White vs. Franklin Bank is, that here the money was raid after the contract was completed and in final execution of it, and when the benefit had already been exhausted by the plaintiff, and he had, therefore, voluntarily waived the protection which the statute gave him. He could not have been compelled to pay the money, but he chose to do so. In White vs. Franklin Bank, on the contrary, White was seeking to recover back the money which he had, as it were, paid in advance, in order to get whatever real or imagined benefit there was in the contract for him. There was another ground on which the latter case might well have rested. White brought his action while the illegal contract was yet executory, before the stipulated credit on the deposit had expired, and, therefore, in disaffirmance of the contract. He availed himself of the locus penitentias. *305 Had Mills, while the notes discounted for bim or bis friends were yet running to maturity, and before his liability on bis endorsement had been fixed, brought trover, after demand and notice, for his collaterals, he might perhaps have fared better.
But it is not necessary for the purposes of this case to have said so much on this particular point. The act of the defendant in exacting the excess of charges is not so reprobated by the statute as to “ mark” it criminal in the defendant. It is not made to constitute a public wrong,' against which the vengeance of the law is denounced: it is visited with no specific penalty. The utmost that can be imagined in that direction is that this provision of the charter constitutes a condition upon which the company’s continued enjoyment of one of its franchises is made dependent. But it may well be doubted if this even be so. Is it likely that the General Assembly intended that the charter, or any of the privileges it confers, should be forfeited, if at any time the company should charge three dollars freight on a single bale of cotton of four hundred pounds weight ?
In the railroad charters of this State, there is granted to the company, not only the exclusive right of transportation or conveyance on their road, which is further secured to them by severe penalties against intrusion by others, but also in many cases, as in the case of this company, there is prohibited the construction of any rival road between the same points, or within a certain prescribed distance from their line on either side. And to guard against a misuse of these exclusive privileges to the injury of those dealing with them in their character of carriers, the charter places certain fixed restrictions, sometimes in one form and sometimes in another, upon their right to regulate the rate of compensation which they may exact for the services they, are to render. But for such statutory restrictions this *306 right would be-controlled only by the ordinary influences, including as tbe chief the relation between demand and supply, which regulate prices. The restrictions which are imposed are substantive and independent regulations of law defining their powers, like the Acts limiting the tolls on turnpikes, bridges or ferries, or prescribing the fees of public officers. They were contrived for the usual and normal condition of the country, and were certainly not adapted to the extraordinary state of things existing when the transactions now under review were passing. Yet, as there is no dispensing power, short of that which originally imposed them, their legal obligation continues, and, when properly invoked, must be equally enforced at all times. They constitute, or may be made to constitute, a very effectual protection against exorbitant charges. If rates exceeding them are demanded by the company as a condition precedent to their acceptance of goods for carriage, or to their delivery thereof at the place of consignment, the party wronged would, by tendering the full amount of the lawful charges, be well entitled to his action, in the former event on the case for damages for their breach of duty as common carriers in not receiving the goods, and, in the latter, of trover for the value of the goods detained, or assumpsit for not delivering according to their contract, against either of which actions they would vainly attempt to justify on such grounds. Or, by paying the rates demanded, under protest, he may reserve to himself, in express terms, a right of action to recover back the excess then clearly shown to have been umoillingly paid, and only extorted from his reluctance by the importance to him of the service which he wishes, and which they have undertaken to, and alone can, adequately render. For their exclusive privileges, shutting out competition from the same kind of transportation, and enabling them, by their greatly superior speed and capacity of their peculiar kind, to suppress all *307 other kinds, do put into tbeir hands a power and create a degree of dependence wbicb they will not be permitted to use for purposes of extortion.
In the present case the objectionable charges were not exacted until after the service in each instance had been fully rendered, and the plaintiff was, for the particular transaction, out of the power of the defendant. An easy mode of insuring the protection designed by the statute was, after tendering the amount that might be lawfully demanded, and refusing more, to stand an action, if the company had chosen to bring one. The defendant’s act of demanding and taking more than the maximum of charges prescribed by the statute is illegal only in this, that the company therein exceeded their rightful power and required that which they had no authority by law to exact. And the case is brought back within the operation of the general doctrine. If the defendant, by withholding from any one his property or right, wring from his reluctant and protesting will money to which the company has no lawful right, it cannot, ex aequo ei bono, be retained, but may be recovered back in this form of action. But if one, with a full knowledge of all material facts, voluntarily pays that, which could not be lawfully demanded of him, he has thrown away his shield, and must abide the consequences; he cannot recover the money. He has waived the protection which the law offered him. His free and intelligent assent has made that right as between them, which would have else been wrong. Volenti non jit injuria.
The reported cases examined, to which the present bears the strongest analogy, are Parker vs. The Great Western Railway Co. (7 Man. & Gr. 253, 49 Eng. C. L. R. 252,) decided in the English Common Pleas in 1844, and Garton vs. The Bristol and Exeter Railway Co. (1 Best & Smith, 112, 101 Eng. C. L. R. 112,) in the Queen’s Bench in 1861. In each of these cases the action was, so far as concerns the *308 present matter, to recover money paid in excess of the charges which, by charter, the company was permitted to exact, and in each case there was a recovery. In the former case, the special verdict found that, “ in every instance before paying, the plaintiff had required the company to deduct the objectionable charges — the excess which he was in his action seeking to recover back — and offered to pay the amount of said charges less the deduction so claimed, and required the company to carry the goods for the charges less the deduction. But the company, refusing to carry unless he paid as they charged without deduction, he was obliged to pay as required, in order to get his goods carried, and' did pay, under protest against their right to demand it" And the Court said: “We are of opinion that the payments were not voluntary. They were made in order to induce the company to do that which they were bound to do without them, and for their refusal to do which an action on the case could have been maintained.” “ The money was paid through necessity and the urgency of the case.” In the latter (Garton’s) case, the arbitrator found as part of the case for the judgment of the Court as follows: “During the whole period” (covered by the claim) “disputes constantly existed between the plaintiffs and the company on the subject of the latter’s charges for the carriage of plaintiffs’ goods on the railway. On June 29th, 1855, plaintiffs caused a written notice to be served on the company, informing them that they disputed their charges, and only paid the same because the company compelled them to do so by detaining their goods, and that in future all payments made by them or their agents would be paid by them under protest until further notice. This notice was never withdrawn by the plaintiffs. Both before, and after the notice also, the plaintiffs’ servants, who, from time to time, paid on their account to the company’s servants the charges for the carriage of goods, were in the *309 habit, at tbe time of paying, of protesting against the charges as excessive and illegal, as it was understood between the defendants’ servants (who received the charges) and tbe plaintiffs’ servants (who paid them) that they were paid under protest, and such charges were in fact always paid by plaintiffs unwillingly, and in order to have their goods carried or delivered, defendants refusing to carry the goods or to deliver them, after they were carried, unless the plaintiffs would pay the charges demanded,” (p. 124.)
The facts of the present case disclosed in tbe report of the Judge below, and recapitulated in the opening paragraphs of this opinion, most abundantly evince that in this ■essential particular this is very wide apart from those cases.
The motion is dismissed.
DunkiN, C. J., and Waedlaw, A. J., concurred.

Motion dismissed.